THE FIRST NATIONAL BANK OF DANVILLE, Plaintiff-Appellant, v. HAROLD E. CARLTON *et al.*, Defendants-Appellees.

Fourth District   No. 4—86—0519

Opinion filed June 2, 1987.—Rehearing denied July 24, 1987.

F. Daniel Welsch, of Welsch & Hall, of Danville, for appellant.

Ralph J. Swanson, of Sebat, Swanson, Banks, Garman & Townsley, of Danville, for appellees.

JUSTICE HEIPLE delivered the opinion of the court:

Suit was brought in Vermilion County by The First National Bank of Danville (bank) against Harold Carlton and Lillian Smoot on a note signed by the defendants. The court granted summary judgment as to Carlton after finding his obligation on the note had been fully satisfied. The court later entered judgment against Mrs. Smoot in the amount of $45,000 and ordered foreclosure of the mortgage on her 40-acre farm. The bank appeals the summary judgment order and the amount of judgment entered against Mrs. Smoot. We reverse and remand.

In 1983, members of Lillian's family, her son, Donald, his wife, Susie, and their three children (the Smoots), were engaged in farming operations. Donald Smoot contacted the bank about the possibility of refinancing Smoot Farms' existing loans at the bank and about borrowing additional funds to meet the 1983 operating expenses and to make the mortgage payment to the Federal Land Bank, which was threatening foreclosure. The bank's representative, Julian Fruhling, informed Don Smoot that the bank would advance the requested funds provided that the note for the $180,000 mortgage payment was

secured by "an acceptable comaker(s) to the bank." Fruhling also indicated that the three notes would be secured by existing grain, 1983 crops, Payment-in-Kind (PIK) proceeds, machinery and equipment, and a security agreement with an assignment of beneficial interest on all real estate owned by the Smoots. Fruhling was later told that Don's mother, Lillian, was willing to mortgage her 40 acres and that Carlton was also willing to sign the $180,000 note.

The Smoots' attorney, Thomas Meyer, prepared a draft of a supplemental agreement captioned "Agreement for Application of Crops Receipts," which set out the order in which the proceeds from the PIK corn and 1983 crops would be applied to repay the principal and interest on the three notes. Fruhling reviewed the draft, and revisions were made by Meyer and at least one other person, possibly Fruhling.

With the revisions, the Agreement for Application of Crop Receipts (supplemental agreement) provided in pertinent part:

"WHEREAS, the Bank is about to loan Two Hundred Forty-five Thousand Dollars ($245,000.00) to Smoot, and

WHEREAS, Sixty-five Thousand Dollars ($65,000.00) of these funds will be used for 1983 farm operations and One Hundred Eighty Thousand Dollars ($180,000.00) of the funds will be used to make a payment which is owing to the Federal Land Bank, and

WHEREAS, Smoot has in his possession 50,000 bushels of corn which is PIK corn, and

WHEREAS, Carlton, for and in consideration of One Dollar ($1.00) and other good and valuable consideration has agreed to act as a co-maker of the Smoot loan of $180,000.00.

NOW, THEREFORE, the parties agree as follows:

I. The proceeds from the PIK corn and the 1983 crops shall be used to pay the bank in the following order:

1st. Current interest on all notes with the Bank.

2nd. The $65,000.00 operating note.

3rd. A minimum of $135,000.00 on the $180,000.00 note referred to herein.
        * * *

III. The parties agree that if all the payments called for in Paragraph I. are made, Carlton shall be released from any and all obligations under the herein referred to $180,000.00 debt to the bank and he shall have no further obligation thereunder.

IV. It is understood and agreed that Carlton is only acting as a co-maker on the loan of $180,000.00 and has no other obligation on any loans made by the bank to Smoot. In the event

the payments referred to in Paragraph I. are made, the bank agrees that they will look only to Smoot and to the mortgage held on the Lillian Smoot farm for payment of any balance remaining on the $180,000.00 debt."

On May 27, 1983, Lillian, Carlton, and the Smoots met at the bank to sign the various documents. Three notes, all with maturity dates of November 1, 1983, were prepared by the bank. Note A was in the amount of $180,000 and was executed by Lillian, Carlton, and the Smoots; note B established a line of credit of up to $65,000 for the Smoots' 1983 operating expenses and was signed by the Smoots; note C, in the amount of $462,164.52, was executed by the Smoots and consolidated and renewed Smoot Farms' prior existing notes. Lillian executed a real estate mortgage. The typed supplemental agreement was signed by Carlton, Donald Smoot, and his three sons. Lillian also signed a typed document which acknowledged her consent to the supplemental agreement and her agreement that Carlton would be released from further obligation if payments set forth in paragraph I of the supplemental agreement were made.

On October 3, 1983, the Smoots filed a petition under chapter 11 of the Bankruptcy Code for reorganization. On November 21, 1983, the Smoots obtained permission from the bankruptcy court to use cash collateral, the PIK corn and the 1983 crop receipts, for 1984 operating expenses. The bankruptcy court subsequently gave the bank a first lien on the Smoots' 1984 crops as a substitute for its lien on the 1983 crops and PIK corn.

The bank did not receive payments from Carlton, Lillian, or the Smoots on any of the notes, and on May 7, 1984, the bank instituted this action against Lillian and Carlton as co-makers on note A.

The Smoots continued farming until they petitioned to convert the chapter 11 proceeding to a chapter 7 liquidation. A trustee in bankruptcy was appointed and the Smoots' assets were liquidated. Of the funds the Bank received, we need only concern ourselves with the sum of $293,351.31, which is the amount the bank received on June 2, 1986, from the sale of the crops on which the bank had a lien. The bank did not apply the proceeds according to the terms of the supplemental agreement. Rather, the record shows that the bank applied approximately $228,000 to pay the balance of note C, $55,000 to pay the principal balance of note B, and approximately $10,000 toward accrued interest on note A.

At the close of the bank's evidence, the trial court granted Carlton's motion for summary judgment and held that interest on notes B and C, which only the Smoots signed, ceased to accrue in October

1983 when the Smoots filed their bankruptcy petition. The court also determined that interest on note A, which Carlton and Lillian signed, continued to accrue until June 2, 1986, when the bank received the proceeds under the bankruptcy court's distribution order. Finally, the court ruled that the $293,000 the bank received from the crop sales should have been applied in accordance with the supplemental agreement and that if it had, Carlton's obligations under the supplemental agreement would have been satisfied. After hearing further evidence, the trial court determined that Lillian was liable for the balance of note A, which it determined to be $45,000, plus interest from June 2, 1986, and ordered foreclosure on the 40 acres she mortgaged.

The bank appealed the trial court's summary judgment order and the judgment against Lillian, asserting that the amount awarded was insufficient. Although Lillian Smoot elected not to file a brief in this appeal, we will decide the issues which apply to her as the record is simple and the claimed errors are such that they can be easily decided without the aid of her brief. (See *First Capitol Mortgage Corp.v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128.) We reverse and remand for further proceedings.

The bank first asserts that the trial court incorrectly determined that the supplemental agreement dictated the proper application of the proceeds from the crop sales. The bank contends that the supplemental agreement applied only to voluntary payments made by the debtors prior to default. We disagree.

■■ ■ It is well established that where ambiguities exist between a typed portion of an instrument and a printed provision in the instrument, the typed provisions will prevail. (*Farmers & Mechanics Bank v. Davis* (1981), 97 Ill. App. 3d 195.) Therefore, the typed supplemental agreement, which establishes certain obligations of Carlton, Lillian, and the bank, determines the proper disposition of the crop proceeds and the bank was not free to direct the applications of the proceeds in a manner inconsistent with the terms of the supplemental agreement. That the proceeds were the result of the sale of collateral after default is irrelevant. The terms of the supplemental agreement provide that the proceeds are to be applied in a particular order; there are no time limitations on the terms, so it cannot be suggested that the supplemental agreement somehow expired upon default or upon the filing of the Smoots' petition in bankruptcy. Therefore, the trial court correctly determined that the bank should have applied the proceeds from the sale of the crops in accordance with the terms of the supplemental agreement.

Next, the bank contends that the trial court erred in holding that

interest ceased to accrue on notes B and C upon the filing of the chapter 11 petition. The bank asserts that because the bankruptcy court allowed the Smoots to use cash collateral after the bankruptcy petition was filed, that court necessarily found that the bank was adequately secured and, therefore, it is now entitled to collect post-petition interest on notes B and C. We agree with the bank's contention, but not with its reasoning.

■ The supplemental agreement, which we previously held controlled the application of the crop proceeds, provides that the proceeds would first be applied to pay current interest on all notes with the bank. In determining the amount of "current interest," the trial court correctly determined that the interest on note A, which Carlton signed as a co-maker, continued to accrue as to Carlton until June 2, 1986, when the bank received the proceeds from the trustee in bankruptcy. The court noted that Carlton was a maker of the note and remained obligated to pay the principal and interest, regardless of whether other makers of the note went into bankruptcy.

When calculating the amount of interest on note C, the $462,000 note, which was to be paid from the crop proceeds, the court determined that Carlton could not be charged with interest accruing after the first bankruptcy petition was filed because it was his impression that interest ceased to accrue upon filing and, further, that any post-petition interest would be the obligation of the bankruptcy estate. From the record, it is unclear whether the court held that interest on note B ceased to accrue when the bankruptcy petition was filed; however, the bank and Carlton agree that the court so held.

■ The trial court erred in finding that interest accrual on notes B and C automatically ceased when the chapter 11 petition was filed. Therefore, we hold that interest on all three notes continued to accrue up to June 2, 1986, when the bank received the crop proceeds. The protective provisions in the Bankruptcy Code (11 U.S.C. sec. 506(b) (Supp. 1979)), which usually serve to stop the post-petition accrual of interest, are not applicable in the instant case. There is no indication that the Bankruptcy Code was ever intended to benefit parties other than the bankrupt. Furthermore, the bank's sole purpose in requiring additional makers on the note was to ensure that it would receive payment in the event that the Smoots were unable or unwilling to pay. It is unfortunate that the Smoots went into bankruptcy and were unable to pay, but this unfortunate circumstance does not relieve Lillian Smoot or Carlton of their obligations under the note and the supplemental agreement. Carlton, by signing the supplemental agreement, and Lillian, by consenting to the agreement, acknowl-

edged that the crop proceeds would first be used to pay current interest, next to pay the note for operating expenses, and finally, to pay the $180,000 note which they signed. Since neither Carlton nor Lillian filed for bankruptcy, the Bankruptcy Code provisions regarding the tolling of interest do not apply to them; therefore, as to Carlton and Lillian, interest on notes B and C did not cease to accrue until the bank received the proceeds from the trustee.

Because the bank was entitled to interest on all three notes up to June 2, 1986, the trial court's finding that interest ceased in October of 1983 is incorrect and we reverse. Since the trial court's judgments as to Lillian and Carlton were based on improper interest calculations, we remand for further proceedings consistent with this opinion.

Reversed and remanded.

BARRY, P.J., and SCOTT, J., concur.